### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. |
| ) | 2:19-cv-01803-CMR |
| v.  ) | |
| ) | |
| **DEFENDER ASSOCIATION OF PHILADELPHIA** ) | |
| ) | |
| Defendant. ) | |

### PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

EEOC hereby submits its Reply in Support of its Motion for Summary Judgment, ECF No. 127.[1] EEOC incorporates by reference its Brief in Support of its Motion for Summary Judgment, ECF No. 127-1, its Statement of Stipulated Material Facts ("SSMF"),[2] its Statement of Additional Material Facts ("SAMF"),[3] its Supplemental Statement of Additional Material Facts ("SSAMF"), attached as Exhibit A, as well as its Response to Defendant's Motion for Summary Judgment, ECF No. 118, and its Sur-Reply to Defendant's Motion for Summary Judgment, ECF No. 135.

## I.    RELEVANT FACTUAL BACKGROUND

### A.  Perez's Employment with Defendant.

Perez joined Defendant in September 2007 as a full-time staff attorney and for almost the next ten years, she successfully worked as an attorney in numerous units/divisions, in both non-supervisory and supervisory roles. SAMF at ¶¶ 1-3; SSMF at ¶¶ 1-4. In April 2017, she became Supervisor of the Juvenile Special Cases Section ("JSCS"), SSMF at ¶ 5, where she worked on cases involving sex-based crimes, SAMF at ¶ 4.

In July 2017, Perez began therapy with Laurie Patterson ("Patterson"), SSMF at ¶ 6, a

---

[1] In its Response, Defendant did not address its First Affirmative Defense, and thus EEOC's Motion as to that defense is uncontested. Accordingly, for the reasons set forth in its Brief in Support of its Motion for Summary Judgment, EEOC is entitled to summary judgment as to Defendant's First Affirmative Defense.
[2] Attached as Exhibit A to its Brief in Support of its Motion for Summary Judgment.
[3] Attached as Exhibit B to its Brief in Support of its Motion for Summary Judgment.

licensed clinical social worker, SAMF at ¶ 5, and shortly thereafter, on July 28, 2017, she began a medical leave of absence under the Family and Medical Leave Act ("FMLA"). SSMF at ¶ 7. Patterson thereafter diagnosed Perez with Post-Traumatic Stress Disorder ("PTSD") and Major Depressive Disorder. *Id.* at ¶ 8. On August 8, 2017, Perez's primary care physician faxed a completed "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)" form to Defendant in support of Perez's request for FMLA leave. SAMF at ¶ 6. Therein, she notified Defendant of Perez's "████████████████████████████." *Id.* at ¶ 9.

Defendant's employees are entitled to receive short-term disability ("STD") benefits on the fifteenth day of their medical leave. *Id.* at ¶ 10. Lincoln Financial ("Lincoln"), Defendant's short-term and long-term disability insurance provider, approved Perez's claim for STD benefits for the period August 11, 2017 through September 11, 2017. *Id.* at ¶ 11. Defendant's STD policy provides for a maximum of eleven weeks of coverage, at which time the employee will return to work or be eligible for long-term disability ("LTD"). *Id.* at ¶ 12.

On September 13, 2017, Perez notified Defendant's Human Resources ("HR") Assistant Erica Davenport that her "████████████████████████████████████████ ████████████████████████████████████████████ ████████████████" *Id.* at ¶ 13. Perez shared with Davenport that she had ████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████. *Id.* Davenport forwarded Perez's email to HR Manager Sherri Darden and Director of HR Mark Sappir. *Id.* at ¶ 14. On September 28, 2017, Lincoln extended Perez's STD benefits to October 27, 2017.[4] *Id.* at ¶ 16.

On October 18, 2017, Patterson prepared an Intake, Record Summary, and Assessment for

---

[4] October 27, 2017 was the 11th and final week Perez would be eligible for STD benefits.

Megan Perez (the "October 2017 Medical Memorandum") for Lincoln, SSMF at ¶ 9; SAMF at ¶ 17,

which included Patterson's assessment that:



SSAMF at ¶ 1. Patterson noted that it was █████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ SSAMF at ¶ 2.

In the "Recommendations going forward" section, Patterson stated:

The plan is for Ms. Perez to return to her job in January 2018. I am unable to
currently say at this time whether that is feasible, but if it is, I would recommend that
she phase in part time as it has been very hard for her to tolerate discussions about
work in our sessions, and the one time she went to the office, she had a panic attack
and was unable to go into the building.

I do not currently see that it would be wise or advisable for her to resume work in any
capacity where she needs to perform work in the previous role as related to working
as a mitigation specialist or trainer working with the sex offender population. While
Ms. Perez has a passion for social justice she and the Defender Association may be
better served if she works in a less triggering unit at this organization.

Thank you for your interest in this interesting and capable individual.

Please do not hesitate to contact me if you have any further questions or concerns.

SSMF at ¶ 10. Patterson conditioned her recommendation for Perez's return to work on her transfer

to a position outside the JSCS and not involving sex crimes, as she was less confident about the

feasibility of Perez's return to her former job or to any position that involved sex crimes. SSAMF at ¶

3; *see also* SAMF at ¶ 35; *Id.* at Ex. 2, Patterson Dep. Tr. at 68:22-69:3.

Lincoln's records acknowledged receipt on October 24, 2017, and specifically indicated that

Perez may return to work on "1/18/2018." SAMF at ¶ 17. The only temporal requirement to qualify

for LTD benefits under Defendant's policy is the expiration of the 90-day elimination period. *Id.* at ¶

18. Therefore, upon receiving Patterson's October 2017 Medical Memorandum stating that Perez

needed leave until January 2018, Lincoln approved Perez's eligibility for LTD benefits upon the

expiration of her STD benefits, pending earnings information from Defendant. *Id.* at ¶ 19. Darden

thereafter sent Perez a letter confirming that ████████████████████████████████

███████████████████████████. *Id.* at ¶ 20.

### B.  Defendant's Practice of Terminating Employees Upon Approval of LTD Benefits

Defendant automatically terminated any employee who had been approved for LTD Benefits.

*Id.* at ¶ 25. Darden, whose employment with Defendant began in 1989, SAMF at Ex. 15, Darden

Dep. Tr. at 14:1-4, and who was Defendant's HR Manager at the time of Perez's termination,

affirmed this practice:

> Q. Was there a policy or practice, while you were the manager of HR, to terminate
> employees upon their approval for long-term disability benefits?
> A. Yes. There was a practice that had been in place before I was a manager. That was
> a Defender practice.
> Q. How long had that been the practice?
> A. Probably way before me. It was there my entire time, even as an assistant.
> Q. Was this all employees, or just attorneys?
> A. All employees.

*Id.* at Ex. 15, Darden Dep. Tr. at 25:12-23. According to Keir Bradford-Grey, the Chief Defender at

the time of Perez's termination, the "practice has been going on for about 25 years in this

organization, and it did not start with Sherri Darden. It was actually -- Sherri was trained to do it."

SAMF at ¶ 26; SAMF at Ex. 16, Bradford-Grey Dep. Tr. at 31:3-7.

Defendant's reasoning behind its long-standing practice is that:

> [W]hen people are accepted onto long-term, <u>the assumption</u> is that they cannot return.
> It's an indefinite illness and the extended time that was required, we couldn't define
> it, so we would term[inate] under the pretenses that people would be allowed to
> return once they were well . . . .

SAMF at ¶ 28 (quoting SAMF at Ex. 15, Darden Dep. Tr. at 27:9-15) (emphasis added). Nor would

Defendant review the underlying medical information for the LTD request prior to terminating an employee, SAMF at ¶ 27, and Darden lacked any discretion to determine whether the employee was allowed to work. SSAMF at ¶ 4. Instead, the "decision from Lincoln to approve someone for long-term disability benefits was sufficient in and of itself to result in the employee being terminated." SAMF at Ex. 15, Darden Dep. Tr. at 36:5-9.

### C. Defendant Terminated Perez Pursuant to Its Practice

Per Darden's request, on November 16, 2017, Perez notified Darden that she had been automatically approved for LTD benefits when her STD expired. SAMF at ¶ 21; *Id.* at Ex. 14, November 16, 2017, Emails Between M. Perez and S. Darden.[5] Perez also notified Darden that ████████████████████████████████████████████████. SAMF at ¶ 23. On November 17, 2017, she provided Darden with Patterson's October 2017 Medical Memorandum, which stated that "[t]he plan is for Ms. Perez to return to her job in January 2018" and recommended a job transfer as an additional accommodation for Perez. *Id.* at ¶ 24; SSMF at ¶ 10. Despite Perez's and Patterson's repeated statements about Perez's January 2018 return, Defendant took no action to prepare for Perez's transfer to a different position, and instead prepared for Perez's termination.

Upon learning of Perez's approval for LTD benefits and her plan to return to work in January 2018, on November 17, 2017, Darden and then HR Director Sappir discussed Defendant's practice of terminating employees upon their receipt of LTD benefits and consistent with that practice, the plan to terminate Perez upon confirming that she had been approved for LTD benefits, (notwithstanding

---

[5] Defendant claims that Perez had to provide "verification" to Lincoln when applying for LTD benefits that she was "totally disabled." Resp. in Opp. at 19-20. As the record evidence establishes, it was Patterson who provided Lincoln with the October 2017 Medical Memorandum that made clear that Perez needed to remain out beyond the October 20, 2017, expiration of her STD benefits and would thus be entitled to LTD benefits until January 2018. Further, Lincoln's determination of November 2017 that Perez was "totally disabled" is not inconsistent with Perez's later ability to return to work in January 2018 as Perez and Patterson projected, and to which Lincoln agreed, as at that point it approved LTD benefits only until January 18, 2018. EEOC has addressed this "totally disabled" claim in its Response to Defendant's Motion for Summary Judgment, ECF No. 118 at 3-6, and its Sur-Reply to Defendant's Motion for Summary Judgment. ECF No. 135 at 3, which are incorporated herein by reference.

her plan to return several weeks later). SSAMF at ¶ 5. On the same day, Darden received

confirmation from Lincoln that Perez had been approved for LTD benefits. SSAMF at ¶ 6.

That following Monday, November 20, 2017, HR Director Sappir provided Darden with a

proposed "off-boarding" letter to be used after Darden notified Perez of her pending termination,

which stated:

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

SAMF at ¶ 29; *Id.* at Ex. 18, November 21, 2017 email (emphasis added). As of that day, November

20, 2017, Defendant had decided to terminate Perez because of her LTD status. SSAMF at ¶ 7.

The timeline between learning of Perez's LTD approval and the decision to terminate her was

short:

- o On Thursday, November 16, 2017, at approximately 6:30 p.m., Perez told Darden that she had been approved for LTD benefits.

- o On Friday, November 17, 2017, Darden and Sappir spoke about confirming Perez's LTD approval before terminating her under Defendant's practice, which Darden did.

- o On or before Monday, November 20, 2017, Defendant decided to terminate Perez as a result of her being approved for LTD benefits, notwithstanding her plan to return about six weeks later, in January 2018.

Thereafter, on November 29, 2017, Darden orally notified Perez that she was being

terminated based on Defendant's practice. SAMF at ¶ 30, According to Darden:

> The conversation that I had with her was concise. It was not long at all. There were
> not that many back and forths. It was specifically based on the fact that she had been
> accepted for long term, and that, based on what long-term means and what it means
> to the Defender, our practice was that, once somebody is on long term, it is assumed
> that they do not have a definite date to return because the long term doctors, as well
> as her doctor, had provided information and that was their determination. Based on
> that, I was terminating her, not my choice, but what the requirement was and what
> has been done at the office. It was not my decision at all. It's based on what we do.

SAMF at Ex. 15, Darden Dep. Tr. at 178:21-179:10 (emphasis added). In response, Perez reminded

Darden that she was prepared to come back in January. SAMF at Ex. 1, Perez Dep. Tr. at 217:19-22.

However, under Defendant's practice, and its false assumptions about indefinite leave, Perez's and Patterson's intentions for her to return in January 2018 were disregarded.

On December 14, 2017, Darden gave written notification to Perez that she was being terminated on December 15, 2017, SSMF at ¶ 11, just one month before her intended return to work, SAMF at ¶ 32. The letter did not include any statement regarding the possibility of reemployment, but acknowledged that Perez had been approved for LTD benefits. SAMF at ¶ 31. It is undisputed that in its termination of Perez, Defendant relied solely on Perez's LTD approval and sought no additional information from Perez or Patterson. SSAMF at ¶ 8; SAMF at ¶ 30, 33.[6]

Had Defendant contacted Patterson in order to seek additional information concerning Perez's intention to return in January 2018, the uncontroverted record evidence establishes that Patterson would have reiterated that Perez could return in January 2018 to a role that did not involve working on cases involving sex crimes, in line with Perez's September 13, 2017 and November 16, 2017 emails to Defendant, and Patterson's October 2017 Medical Memorandum. SAMF at ¶ 34. Patterson would have also explained to Defendant that any concern about the feasibility of Perez returning in January 2018 was based solely on Perez returning to her prior role involving sex offenders—not to an alternative position. *Id.* at ¶ 35. Further, as of January 2018 and thereafter, Defendant had available positions for which Perez was qualified that did not involve working on sex crimes. *Id.* at ¶¶ 36-37. According to Chief Defender Bradford-Grey, "if [Perez] wanted to come back, she's a lawyer who was rotated through all the different units in our organization. She can come back and do whatever the needs are. We always have needs here," and that "[i]t would have been very easy" to transfer Perez to a different position, as Perez "was a Spanish-speaking, experienced trial lawyer." *Id.* at ¶ 37. Despite these available positions and the short time needed for

---

[6] Q. [I]s it accurate to say that the sole reason for terminating Ms. Perez at this time was because she was on long-term disability?
A. That is accurate, and that is what was communicated to her.
SAMF at Ex. 15, Darden Dep. Tr. at 111:24-112-4.

the conclusion of her medical leave, her termination was permanent.

> Defendant's termination of Perez took a further toll on Perez's mental wellbeing:
>
> [T]he therapy and the work that I had been doing with [Patterson] was all preparing me to return to work in January. That was the goal. When I was fired, that goal changed. It was a real setback for my depression and for a lot of the work that we had been doing, and she encouraged me, instead of backsliding, to use it as an opportunity to go deeper in my recovery. So that rather than kind of chipping away shallowly at the underlying effects so that I could be stable enough to work while doing therapy, I instead just take that opportunity, don't focus on going to work then, go deep and resolve everything sort of as deeply and quickly as possible so that I can maximize my time.
>
> So the goals changed after that, after I was fired.

SAMF at Ex. 1, Perez Dep. Tr. at 206:23-207:17. Patterson altered her treatment plan for Perez as a result of her termination, which she considered a new trauma. SSAMF at ¶ 9. In a February 2018 update for Lincoln, Patterson confirmed that after Perez's termination, it was in Perez's best interest to have at least nine months of treatment without having to seek employment. SSAMF at ¶ 10. As Patterson projected, about nine months later Perez returned to work. She applied to a number of legal positions and obtained work with two different solo practitioners, and also served as a nanny. SSAMF at ¶ 11. Finally, on June 15, 2020, Perez obtained employment with a small law firm, and began earning at least as much as she would have earned had she not been terminated from Defendant. SSAMF at ¶ 12.

## II.  LEGAL STANDARD

A party is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Such disputes exist only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McIlvaine v. 1SEO Techs., Inc.*, 485 F. Supp. 3d 582, 584 (E.D. Pa. 2020). "While the moving party bears the initial burden of showing the absence of a genuine issue of

material fact, meeting this obligation shifts the burden to the non-moving party who must 'set forth specific facts showing that there is a genuine issue for trial.'" *Beneficial Mut. Sav. Bank v. Stewart Title Guar. Co.*, 36 F. Supp. 3d 537, 543 (E.D. Pa. 2014) (quoting *Anderson*, 477 U.S. at 250). When cross-motions are filed, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered . . . ." *Id.* at 544.

### III. ARUGMENT

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . ." 42 U.S.C. §12112(a). It also prohibits "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer can demonstrate that the accommodation would impose an undue hardship. 42 U.S.C. §12112(5)(A). As discussed below, Defendant violated both provisions, warranting summary judgment for EEOC on both claims.

**A.  EEOC Is Entitled to Summary Judgment on Its Wrongful Termination Claim.**

The *prima facie* case on its wrongful termination claim requires EEOC to show that Perez (1) was disabled; (2) was a qualified individual; and (3) suffered an adverse employment decision as a result of discrimination. *See Campo v. Mid-Atl. Packaging Specialties, LLC*, 564 F. Supp. 3d 362, 380 (E.D. Pa. 2021) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)). Defendant does not dispute the first element—Perez's disability—and for that reason, EEOC need not brief her status as an individual with a disability. As discussed below, and for the reasons set forth in its Motion for Summary Judgment, the undisputed facts support summary judgment pertaining to disability-based termination.

**1. Perez Was A Qualified Individual When Defendant Discriminated Against Her.**

**i. Perez's Accommodation Requests Must Be Considered When Determining Her Qualified Status.**

"The term 'qualified individual' means an individual who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual

holds or desires." 42 U.S.C. § 12111(8). As already discussed, Perez sought two accommodations to

enable her to return to work: that she (i) remain on medical leave until January 2018 and (ii) not

return to a position that required her to work on cases involving sex crimes. SAMF at ¶¶ 13, 24.[7]

That Perez needed leave as an accommodation does not remove her from coverage as a

"qualified individual." *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 150-51 (3d Cir.

2004) (distinguishing New Jersey law, which does not require employers to provide accommodations

when the employee "cannot *presently perform* the job even with reasonable accommodation," from

the ADA, under which leave is an accommodation). Instead, EEOC need only show that had Perez

been granted leave until January 2018, she would have been able to perform the essential functions of

the job upon her return. *Id.*[8] Regarding Perez's request for a transfer, EEOC must only establish that

Perez was able to perform the essential functions of the alternative position upon returning from

leave. *See, e.g.*, *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997). Indeed, Perez maintains her

---

[7] Defendant mischaracterizes EEOC's position as claiming that either accommodation sought by Perez would have rendered her qualified to perform the essential functions of her position. This is not accurate. In its Brief in Support of its Motion for Summary Judgment (and throughout this case), EEOC asserted that Perez sought two accommodations—leave until January 2018 and a transfer to a position that did not involve working on sex crimes—and that with both of these reasonable accommodations, she would have returned in January 2018 to an alternative position. EEOC's Br. in Support of Mot. for Summ. J. at 1-2. As explained herein, the record evidence shows that Perez requested and required both accommodations and that with those accommodations, Perez was qualified to perform the essential functions of an alternative position in January 2018.

[8] In other words, Perez's inability to perform the essential functions of her job while she was on leave is not relevant to whether she was a qualified individual, as the leave itself was the reasonable accommodation required. *Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 701 (E.D. Pa. 2010) ( "It would be entirely against the import of the ADA if [the plaintiff] were not considered qualified because he was not able to perform his essential job functions during his leave, as leave itself was the accommodation requested . . . . "); *Gibson v. Lafayette Manor, Inc.*, 2007 WL 951473, at *7 (W.D. Pa. Mar. 27, 2007) (where the employee requested additional leave as a reasonable accommodation at the expiration of her FMLA leave, "the fact that [the employee] could not return to work in any capacity at the expiration of her FMLA leave is not dispositive of whether she is a 'qualified individual' "). Further, Defendant's practice does not render Perez unqualified. *See Gibson*, 2007 WL 951473, at *7 (noting that Defendant's practice of "automatically terminating employees who could not return to work at the expiration of FMLA leave" was not dispositive as to whether the employee was a "qualified individual" when they sought an extension of their leave beyond the FMLA period).

status as a "qualified individual" based on her ability to perform a job she "desires." *See* 42 U.S.C. §

12111(8). That Defendant omits this plain language from its analysis does not remove her ADA

coverage as a qualified individual, as she was prepared to perform the essential functions of an

alternative position in January 2018, as repeatedly made clear by her and her therapist.

### ii. Defendant Falsely Asserts That Perez Sought Indefinite Leave and Never Requested a Transfer.

Defendant's common refrain that Perez sought indefinite leave—not a reasonable

accommodation—is no more persuasive now than it has been throughout this litigation.[9] Def.'s Resp.

In Opp. at 1-2, 5, 15-17. As it did long ago, Defendant argues that the word "feasible" in Patterson's

October 2017 Medical Memorandum converted Perez's request for leave to an indefinite one,

dooming this case. ECF No. 7-1 at 7-9. The Court rejected Defendant's argument, noting that

whether Perez sought "indefinite leave cannot be resolved in the absence of a developed record."

*EEOC v. Def. Ass'n of Phila.*, 408 F. Supp. 3d 621, 628 (E.D. Pa. 2019). Now with a developed

record, including (i) Perez's September 13, 2017 and November 16, 2017 emails to Defendant

advising of her return in January 2018; (ii) Patterson's October 2017 Medical Memorandum noting

Perez's return in January 2018 to an alternative position; (iii) Lincoln's decision to grant Perez LTD

benefits premised on a return-to-work date in January 2018 and placement in a unit that didn't

involve sex crimes; (iv) Perez's testimony concerning her returning in January 2018; and (v)

Patterson's testimony that Perez could have returned in January 2018 to an alternative position,

SAMF at ¶¶ 13, 17, 23-24, 34-35; SSAMF at ¶ 13, Defendant simply ignores this evidence and

remains wedded to the "feasible" word. To do so, it ignores record evidence that "feasible" referred

only to Perez returning to the JSCS position, and not to an alternative position. SAMF at ¶¶ 34-35;

---

[9] EEOC has never disputed that a request for indefinite leave is not a reasonable accommodation. *See EEOC v. Def. Ass'n of Phila*, 408 F. Supp. 3d 621, 627 (E.D. Pa. 2019). Instead, EEOC asserts, and the evidence proves, that Perez sought a defined period of leave, until January 2018. This Court has already concluded that such a request is not unreasonable. *Id*. at 628.

SSAMF at ¶ 3.[10]

Moreover, Defendant's reliance on the "feasible" word is a post hoc justification for Defendant's unlawful behavior, as it is undisputed that Defendant did not rely on any medical documentation, including the "feasible" word, in its decision-making. Defendant's decision-makers have made clear that they terminated Perez solely based on her LTD status, resulting in Defendant's faulty and blanket assumption that she would be out indefinitely, SAMF at ¶¶ 25-30; SSAMF at ¶¶ 4-8, and not on any language, "feasible" or otherwise, in Patterson's accommodation request. Accordingly, Defendant's attempt to convince the Court that Perez's September 13, 2017 request for "██████████████████████████" SAMF at ¶ 13, along with Patterson's and Perez's notification that she would return in January 2018 amount to a request for indefinite leave, should be rejected.

Also to be rejected is Defendant's representation that "EEOC does not dispute that Perez did not make a request to transfer to a different position." Def.'s Resp. in Opp. at 7. As noted above, Perez advised Defendant on September 13, 2017, that Patterson recommended that she "███████████ ████████████████████████████." SAMF at ¶ 13. The same recommendation appeared in

---

[10] Defendant argues that Perez's LTD status until November 2018 proves that she would not have been able to return to Defendant in January 2018, claiming a lack of evidence to support that her termination resulted in an extension of her LTD beyond January 2018. Def.'s Resp. in Opp. at 6. Defendant ignores Perez's testimony that her termination was a "real setback for [her] depression and for a lot of the work that [she and Patterson] had been doing," and that, as a result, her pre-termination therapy plan changed. SAMF at Ex. 1, Perez Dep. Tr. at 206:23-207:17. Patterson testified that the termination was a new trauma for Perez and that she decided to change her therapy plan in light of Perez being terminated. SSAMF at ¶ 9. This included Patterson's recommended to Lincoln, in February 2018, that Perez remain out of work for approximately nine months in order to engage in treatment. SSAMF at ¶ 10. Defendant has not, and cannot, cite to any contradictory evidence. Further, even if such evidence existed, Defendant, having failed to assist Perez by seeking additional information about her return date prior to terminating her, "cannot now argue, with the benefit of hindsight, that its actions were justified." *Gibson v. Lafayette Manor, Inc.*, 2007 WL 951473, at *9 (W.D. Pa. Mar. 27, 2007) (where the employee sought additional leave and the employer assumed it was indefinite and failed to seek more information, the employer could not rely on later obtained information that called into question the employee's ability to return); *Caldwell v. Omega Apparel Inc.*, 2015 WL 7455553, at *6 (M.D. Tenn. Nov. 23, 2015) (where a student alleged that the university failed to accommodate her with respect to a practicum, "[u]sing hindsight to evaluate the viability of a practicum is not a basis on which to evaluate whether [the university] made reasonable accommodations. ") (internal citations omitted).

the October 2017 Medical Memorandum. SSMF at ¶ 10. Further, EEOC has consistently

demonstrated that Perez sought a transfer as one of her reasonable accommodations. EEOC's Br. in

Support of Mot. for Summ. J. at 1, 4. This record evidence exists, even if Defendant does not

acknowledge it.

### iii. Perez Could Have Performed the Essential Functions of an Alternative Position in January 2018 Had Defendant Accommodated Her.

With a January 2018 return date and an alternative position, the undisputed record evidence

establishes that Perez would have been able to perform the essential functions of the job. It is

undisputed that Perez enjoyed a successful ten-year tenure with Defendant wherein she rotated

throughout the organization and was twice promoted to supervisory roles. Compl. at ¶ 43; Answer at

¶ 43; SSMF at ¶¶ 1-5; SAMF at ¶¶ 1-3.[11] As the then-Chief Defender testified, Perez had "rotated

through all the different units in our organization. She can come back and do whatever the needs are.

We always have needs here," and "[i]t would have been very easy" to transfer Perez, as she "was a

Spanish-speaking, experienced trial lawyer." SAMF at ¶ 37. It is clear that Perez was qualified to

return the organization so long as it was to an alternative position. It is also undisputed that positions

Perez was qualified for existed in January 2018, and thereafter. *Id.* at ¶ 36. Defendant's claim that

Perez was not qualified therefore lacks merit.

### 2. Perez Was Terminated as a Result of Discrimination.

As Perez's termination is undisputed, the following discussion establishes that there is both

direct and indirect evidence of discrimination underlying her termination.

---

[11] Defendant ignores Perez's decade of career success when arguing, without evidentiary support, that she could not return in January 2018 due to an "extensive history of depression and PTSD," Def's. Resp. in Opp. at 6-7. Defendant's stereotypical assumptions speculating about her unfitness to continue her career is also problematic under the ADA. As noted earlier, however, it was only the JSCS position that triggered Perez's condition, which is why Patterson recommended that Perez be transferred to a "less triggering unit" within Defendant's organization upon her return. SSMF at ¶ 10; SSAMF at ¶¶ 1-3. Defendant's selective reliance on Patterson's summation of Perez's medical history, while ignoring Patterson's remedy to return Perez to an alternative position in January 2018, only bolsters EEOC's claim that Defendant was unwilling to accept Perez in any capacity.

### i. Defendant's Termination of Perez Pursuant to a Practice that Violates the ADA is Direct Evidence of Discrimination.

It is undisputed that Defendant terminated Perez under its long-standing practice of terminating employees upon their approval for LTD, while also disregarding her underlying medical information and her planned return to work in January 2018. Under this practice, Defendant foregoes any interactive process with the employee and their medical provider, and any individualized assessment of the employee's medical condition, the likely duration of their leave, or whether additional leave can be provided without Defendant experiencing an undue hardship. Because a practice of automatically terminating employees who are entitled to LTD benefits inevitably targets qualified individuals with disabilities for termination without considering whether they require reasonable accommodations, it is a *per se* violation of the ADA, similar to a 100-percent healed policy or a maximum medical-leave policy.[12] As Defendant's "sole reason" for terminating Perez

---

[12] *See, e.g., Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 195 (3d Cir. 2009) (finding that a 100 percent healed "policy could be per se violative of the ADA because, when it is applied against qualified individuals with disabilities, it would, by its very terms, discriminate against those protected individuals on the basis of their disabilities, systematically denying them the reasonable accommodations to which they are entitled and excluding them from employment for which they are otherwise qualified. ") Indeed, Defendant's practice of terminating employees based on their approval for LTD benefits is strikingly similar to a maximum medical-leave policy, because it terminates all employees who require leave while receiving LTD benefits, which by definition is leave beyond the 90-day exclusion period. *See Equal Emp. Opportunity Comm'n v. W. Distrib. Co.*, 2022 WL 17853422, at *6 (D. Colo. Dec. 22, 2022) ( "If Defendant does in fact discharge its employees in the way Plaintiff alleges (no exceptions, no notice), then its maximum-leave policy would displace the individualized assessment of whether an employee can perform their job with or without accommodations mandated by the ADA. "). Defendant claims that such policies are not per se violative of the ADA so long as the employer engaged in an individualized assessment of the employee before applying the policy. Def.'s Resp. in Opp. at 9-11. In fact, Defendant cites to *Hohider* to support this proposition, emphasizing the portion of the holding that (i) requires not only the existence of a policy but also that someone was discriminated against under it, and (ii) that no liability would exist even if a person was terminated under such a practice unless the person terminated was disabled and a qualified individual. *Id.* at 11. However, neither point supports Defendant. Here, it is undisputed that (i) Defendant had a practice of automatically terminating disabled individuals upon their approval of LTD benefits without engaging in an interactive process to individually assess whether the person could return to work with accommodations; (ii) Perez was disabled and terminated under this practice because she was approved for LTD benefits, despite having requested reasonable accommodation to allow her to return to work; and (iii) Perez was qualified to perform the essential functions of an alternative position in January 2018, consistent with her requests for reasonable accommodations. In enforcing its practice, Defendant <u>assumes</u> that those approved for LTD benefit are seeking indefinite

was her approval for LTD benefits, in accordance with its practice, EEOC has set forth undisputed direct evidence of discrimination.[13]

Defendant attempts to avoid this outcome by denying the existence of this practice,[14] denying that it terminated Perez pursuant to this practice, and denying anyone else's termination pursuant to this practice. Def.'s Resp. in Opp. at 9-10. The first two points have already been addressed. Regarding the third, Defendant cites to its "SSMF" at ¶ 36, which includes a parenthetical of Bradford-Grey's testimony which claims she stated that "'[Perez's administrative termination is] the only time . . . this has happened' since at least 1999, when Bradford-Grey's tenure began." (alterations in original). First, Defendant's representation of 1999 is false, as Bradford-Grey's tenure

_____

leave which is not a reasonable accommodation and thus needn't be granted. Thus, by its very nature, it assumes that no interactive process is necessary because the disabled employee cannot return. This is why, as the language cited by Defendant itself establishes, that Defendant's practice is a per se violation of the ADA and its application to Perez, a qualified individual with a disability, constitutes direct evidence of discrimination.

[13] *See Burress v. City of Franklin, Tenn.*, 809 F. Supp. 2d 795, 811 (M.D. Tenn. 2011) (noting a letter from the employer regarding his termination that stated "I understand that you are currently receiving long term disability and that you are unable to return to perform the essential functions of your job at this time. Should you recover from your medical condition and no longer be disabled, you may wish to re-apply for employment opportunities . . . ." constituted direct evidence of disability discrimination and that the "letter, standing alone, is sufficient to permit a jury to conclude that Burress was terminated because of his disability, without the need for drawing any inferences. "); *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (policy that allows airline captains "who become disqualified for any reason other than age to 'bump' less senior flight engineers" is discriminatory on its face and constitutes direct evidence of discrimination.); *Garcia v. Newtown Twp.*, 483 F. App'x 697, 704 (3d Cir. 2012) ("Direct evidence [of discrimination] may take the form of a workplace policy that is discriminatory on its face . . . . "); *431 E. Palisade Ave. Real Est., LLC v. City of Englewood*, 977 F.3d 277, 284 (3d Cir. 2020) ( "direct evidence of intent is supplied by the policy itself. ") (internal quotations omitted).

[14] Defendant detours into a legally irrelevant argument that EEOC is unjustified in pursuing this alleged claim of a "pattern or practice" violation pursuant to 42 U.S.C. § 2000e-6(a), as incorporated into the ADA by 42 U.S.C.§ 12117(a). Defendant confuses its "practice" of terminating employees who qualify for LTD with a "pattern or practice" case which has not been alleged in this action. Def.'s Resp. in Opp. at 11-12. EEOC addressed this argument in its Sur-Reply in Opposition to Defendant's Motion for Summary Judgment, ECF No. 135 at 4-5, which is incorporated by reference. In addition, Defendant has waived this argument by failing to deny satisfaction of conditions precedent with particularity. Fed. R. Civ. P. 9(c); ECF No. 26 at ¶ 9; *EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 332-34 (5th Cir. 2012). Further, it is meritless, as Defendant has admitted that EEOC provided it with a letter of determination concerning the claims in this lawsuit, which satisfied EEOC's conditions precedent on this issue. ECF No. 26 at ¶¶ 7-9; *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 494 (2015). The Court should not be distracted by this detour.

as Chief Defender did not begin until 2015. SSAMF at ¶ 14. Second, Bradford-Grey only claimed

that Perez's termination under the practice was the only time she "understood" it had happened, as

opposed to knowing whether it had happened to anyone else since 2015. Third, and most

importantly, Bradford-Grey admits that, at a minimum, Perez was terminated under this practice. To

deny that others were terminated under this practice, Defendant relies on Darden's testimony, who,

when asked whether from 2015 through 2018 others were terminated under Defendant's practice,

responded that in 2015 there "may have been one . . . [but she] can't say for sure . . . ." SSAMF at ¶

15. That there may, or may not, have been anyone other than Perez terminated under this practice

from 2015-2018 is not the same as no one being terminated under this 25+ year practice that

Defendant claims to have recently discontinued.[15]

### ii. Defendant's Termination of Perez Instead of Allowing Her a Reasonable Accommodations is Direct Evidence of Discrimination.

Not only does Defendant's practice of automatically terminating employees who qualify for

LTD constitute direct evidence of discrimination, the undisputed evidence establishes that Defendant

terminated Perez instead of engaging in the interactive process and providing her with her requested

accommodations (a short duration of additional leave and a transfer). This also constitutes direct

evidence of discrimination because "[d]iscrimination under the ADA . . . includes failing to make

reasonable accommodations . . . ." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.

1999); 42 U.S.C. §12112(5)(A).

Defendant's recitation of events which it claims satisfied its duty to engage in the interactive

process is unavailing.[16] The interactive process is premised on information sharing between a

---

[15] This also begs the question why Defendant lauds itself on discontinuing a practice that it simultaneously argues didn't exist.

[16] Defendant quotes Darden's generic testimony that under the ADA Defendant "should try to accommodate [disabled employees] to the best of our ability." Def.'s Resp. In Opp. at 10. That Defendant was clearly aware that it was required to provide accommodations, and that a request for medical leave can constitute an ADA accommodation, SSAMF at ¶ 16, makes its automatic termination of Perez upon her approval of LTD benefits even more egregious.

disabled employee and the employer, such that the employer can determine whether it can provide the requested, or alternative, accommodations. *Id.* at 312-18. EEOC has already established that once Defendant learned that Perez had been approved for LTD benefits, it decided to terminate her, without considering either of her accommodation requests. Now, in order to create the appearance that it engaged in an interactive process, Defendant mischaracterizes the evidence. It made the same claims in its Reply in Support of its Motion for Summary Judgment, which EEOC refuted in its Sur-Reply in Opposition to Defendant's Motion for Summary Judgment, ECF No. 135 at 7-9, which is incorporated by reference.[17]

Defendant also claims that it could "not accommodate Perez's extended leave, but offered her reinstatement." However, an employer cannot refuse to accommodate an employee under the ADA, terminate them instead, and then avoid liability by offering reinstatement after they have gone to the EEOC or to court. While a legally cognizable offer of reinstatement can cut off backpay, it does not extinguish liability. Moreover, Defendant never offered reinstatement to Perez.[18] Finally,

---

[17] Briefly, Defendant's reliance on the September 13, 2017 HR meeting is belied by Darden's and Davenport's testimony, which Defendant relies upon, that neither could recall specifically what was discussed, lending no support to Defendant's claim that it considered Perez's accommodation requests at that time. *See* Darden Dep. Tr. at 89:8-16; Davenport Dep. Tr. at 54:10-55:5. Defendant also cites to Darden's meeting with Sappir after Perez's November 16, 2017 email in which she advised of her return in January 2018 and that she had been approved for LTD benefits. As already discussed in Section I(C) above, the November 17, 2017 meeting addressed Perez's approval for LTD benefits and confirming that this was the case with Lincoln. SSAMF at ¶ 5. By the following business day, November 20, 2017, Defendant already had decided to terminate her. SSAMF at ¶ 7. While Defendant also claims that Darden called Perez to discuss how to accommodate her and requested medical information from her, no testimony supports this. Instead, as noted above, after the call with Perez and within about an hour of receiving Patterson's memorandum containing Perez's accommodation requests, Darden spoke with Sappir, not about accommodating Perez, but about Perez being approved for LTD, the need to obtain confirmation from the LTD carrier, and about applying Defendant's LTD termination practice to Perez. SSAMF at ¶ 5. Thus, Darden and Sappir ignored Perez's accommodation requests and her underlying medical information, focusing instead on terminating her based on her LTD approval. Defendant's meetings about Perez's LTD approval and terminating her under its practice, and its conversations with Perez to obtain the information needed to fire her and then informing her of her termination hardly constitute the "great deal of communication between the employee and employer" required to assess a request for accommodation. *Taylor*, 184 F.3d at 312.

[18] EEOC addressed Defendant's claim that it offered Perez reinstatement in its Response to Defendant's Motion for Summary Judgment, ECF No. 118 at 16-19, which is incorporated herein by reference.

Defendant's claim that it told Perez she could return when she was "medically cleared," ignores that

Patterson had already recommended that Perez return in January 2018 to an alternative position.[19]

In short, Defendant did not engage in any interactive process with Perez, let alone

accommodate her,[20] both in violation of the ADA.

### iii. Defendant Had No Legitimate, Non-Discriminatory Reason for Firing Perez

Perez's approval for LTD cannot constitute a lawful reason for her termination, even when

Defendant argues otherwise. Perhaps its claims that she was unable to perform the essential functions

of her job or she sought indefinite leave could bolster its position, but those arguments are

unsupported by the record evidence. Defendant's asserted reasons for Perez's termination "has no

basis in fact," and "did not actually motivate the discharge," and thereby cannot create a genuine

dispute as to any material fact. *See Harding v. Careerbuilder, LLC*, 168 F. App'x 535, 538 (3d Cir.

2006); *see also Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). As EEOC has set forth

---

[19] Defendant also claims that it accommodated Perez by delaying its termination for a month after it made the decision "to ensure—*at Perez's request*—that she received LTD benefits." Def.'s Resp. in Opp. at 14 (emphasis in original). First, Perez had already been approved for LTD benefits. The issue Defendant raises, as its citations establish, is Lincoln needing additional information from Defendant concerning Perez's compensation in order to provide the mandated amount of LTD monetary benefits. Perez remaining on leave instead of being terminated had no effect on Lincoln's approval at that time, and Defendant provides no evidence to the contrary. In fact, in the November 30, 2017 email from Perez to Darden that Defendant cites, Perez stated that "███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████." SSAMF at ¶ 17. Further, this is another admission that Defendant made its termination decision in mid-November, negating any argument that it considered her accommodation requests after it learned of her LTD approval.

[20] Defendant also claims that there was no accommodation that would have allowed Perez to perform the essential functions of her job. Def.'s Resp. in Opp. at 14-15. In doing so, Defendant claims that Patterson was unable to state with certainty when Perez could return to work and therefore the request was for indefinite leave. This is simply false. Patterson's testimony has established that any concerns she had about a January 2018 return were based on Perez returning to the JSCS role. If transferred, Patterson projected a return in January 2018. Any uncertainty was created by Defendant's failure to speak with her. Defendant also claims that transferring Perez was not a reasonable accommodation because she was not qualified to perform the essential functions of any other position "at the time of her termination," noting that Patterson "did not state that Perez could return underlined immediately to another position." *Id.* at 15 (emphasis added). As it did when terminating her, Defendant ignores that Perez sought both a transfer and leave until January 2018.

undisputed direct and indirect evidence that Perez's termination was the result of discrimination, EEOC is entitled to summary judgment on its termination claim.

**B.  EEOC Is Entitled to Summary Judgment on Its Failure to Accommodate Claim.**

Failure to accommodate claims do not require that the employer's actions be motivated by discriminatory animus directed at the disability or the disabled individual. *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 595 (E.D. Pa. 2017); *Anderson v. Lowe's Home Centers, LLC*, 2022 WL 2134164, at *7 (E.D. Pa. June 14, 2022). Therefore, "the *McDonnell Douglas* test does not apply. Once a plaintiff alleges facts that, if proven, would show that an employer should have reasonably accommodated an employee's disability and failed to, the employer has discriminated against the employee." *McLean v. Abington Mem'l Hosp.*, 2015 WL 5439061, at *6 (E.D. Pa. Sept. 15, 2015) (quotations omitted). In the same vein, "pretext is not an applicable consideration for a court deciding a motion for summary judgment on a failure to accommodate claim." *Emmell v. Phoenixville Hosp. Co., LLC.*, 2018 WL 3727765, at *5 (E.D. Pa. Aug. 6, 2018).

To obtain summary judgment on its failure-to-accommodate claim, EEOC must set forth undisputed material facts demonstrating that (1) Perez was disabled, and Defendant knew of her disability; (2) she requested an accommodation; (3) Defendant did not make a good faith effort to assist; and (4) she could have been reasonably accommodated. *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017); *see also Reyer*, 243 F. Supp. 3d at 595. Defendant has not contested the first element—Perez's disability and Defendant's awareness of it. Accordingly, the discussion below addresses the remaining elements and supports summary judgment for EEOC on its failure to accommodate claim.

**i)  It is undisputed that Perez requested two accommodations.**

"A request for an accommodation does not need to be in writing 'or formally invoke the magic words 'reasonable accommodation,' but 'the notice nonetheless must make clear that the employee wants assistance for his or her disability.'" *Dzuryachko v. Teva Pharms. USA, Inc.*, 2022

WL 837180, at *4 (E.D. Pa. Mar. 21, 2022) (quoting *Taylor*, 184 F.3d at 313). It is undisputed that

on September 13, 2017, Perez informed Defendant that Patterson had recommended that she remain

on medical leave for four additional months and, upon her return, be transferred to a position that did

not require work on cases involving sex crimes.[21] SAMF at ¶ 13. Both requests were reiterated in

Patterson's October 2017 Medical Memorandum that Perez provided to Defendant's HR Manager.

SSMF at ¶ 10; SAMF at ¶ 24. Defendant's receipt of the October 2017 Medical Memorandum

constitutes additional notice of Perez's accommodation requests. *See Taylor*, 184 F.3d at 313 (noting

that a health professional may make the request on behalf of a disabled individual). Defendant does

not deny these notifications. It simply reads into them what is not there. But the record evidence still

establishes that Perez requested accommodations.

### ii) It is undisputed that Defendant did not make any effort to assist Perez by engaging in an interactive process.

After receiving Perez's requests for accommodations to extend her medical leave to January

2018 and to transfer her to a different position, Defendant was obligated to engage in a good faith

interactive process to determine whether feasible accommodations were possible, and, crucially, to

determine whether accommodation was a viable alternative to termination. *Taylor*, 184 F.3d at 312.

In *Taylor*, a seminal Third Circuit decision outlining an employer's duty in considering and

---

[21] Defendant cites to numerous cases, as well as EEOC guidance, to support that indefinite leave is not a reasonable accommodation. Def.'s Resp. in Opp. at 16-17. EEOC has never disputed that indefinite leave is not a reasonable accommodation. *See EEOC v. Def. Ass'n of Phila*, 408 F. Supp. 3d 621, 627 (E.D. Pa. 2019). Instead, EEOC asserts, and the evidence proves, that Perez sought a defined period of leave, until January 2018, which this Court has already found to be reasonable. *Id*. at 628. Defendant also claims that Perez's request was "vague," and relies on an inapposite example from EEOC's guidance where a doctor states that the employee's current condition "does not permit a clear answer as to when he will be able to return to work." Def.'s Resp. in Opp. at 17. Notably, in the cited example, the employer sought clarification by requesting more information directly from the doctor and did not receive the "clear answer." In this case, Patterson did provide a specific return date—January 2018, and Defendant's claimed "uncertainty" was created by its failure to speak with Patterson. Likewise, Defendant's reliance on *Brangman v. AstraZeneca* is misplaced. It falsely claims that the *Brangman* Court held that an employee who seeks additional leave while also seeking LTD benefits is making a request for indefinite leave. In *Brangman*, the plaintiff testified that she "has not been able to work" and never provided a return-to-work date (unlike Perez who provided one). 952 F. Supp. 2d 710, 723 (E.D. Pa. 2013).

providing ADA accommodations, the plaintiff suffered from bipolar disorder and the employer was aware of the disability and the need for accommodation. *Id.* at 314. The Third Circuit noted that "[o]nce the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs." *Id.* at 315 (emphasis added) (noting further that "[d]isabled employees, especially those with psychiatric disabilities, may have good reasons for not wanting to reveal unnecessarily every detail of their medical records because much of the information may be irrelevant to identifying and justifying accommodations, could be embarrassing, and might actually exacerbate workplace prejudice."). "[B]ecause employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if . . . the employee would have been able to perform the job with accommodations." *Id.* at 317-18. An employer is not entitled, "in the face of a request for accommodation, simply to sit back passively, offer nothing and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome." *Id.* at 315. Here, Defendant did exactly what *Taylor* condemns: it passively did nothing and ignored Perez's requests, eschewing engagement in favor of termination.

In November 2017, upon learning that Perez had been approved for LTD benefits, Defendant immediately and reflexively began the process of terminating her, even though it had received her request to extend her leave until January 2018 and return to a different position. Defendant did not seek any information from Perez or her therapist concerning her ability to return to work within the timeframe that had been communicated to Defendant. Had it done so, Patterson, Perez's therapist, would have confirmed that Perez would be able to return in January 2018 provided she was transferred to a position that did not involve sex crimes. Defendant's conduct is "precisely the type of employment practice the ADA seeks to avoid by requiring employees and employers to engage in the interactive process." *Bernhard*, 720 F. Supp. 2d at 701; *see also Williams v. Phila. Housing Auth. Police Dept.*, 380 F.3d 751, 771 (3d Cir. 2004) ( "an employer has a duty under the ADA to engage

in an 'interactive process' of communication with an employee requesting an accommodation . . . .").

     If Defendant needed further information regarding accommodating Perez, "it was incumbent on [Defendant] to ask for it." *See Taylor*, 184 F.3d at 314. Instead, Defendant abdicated its legal obligations under the ADA by relying on a generic LTD approval for an employee who had communicated a projected end date for her medical leave as well as the conditions that would make it possible for her to return within her projected timeframe. That Perez's leave was due to end a mere month after the effective date of her termination, as well as the availability of alternative positions for her, demonstrate an abject failure by Defendant to undertake its duty to engage in an interactive process with her and her therapist about her accommodation requests. As this Court has noted, an employer's failure to engage in the interactive process "supports a finding that the employer did not make a good faith effort to assist the employee in identifying reasonable accommodations." *Dzuryachko v. Teva Pharms. USA, Inc.*, 2022 WL 837180, at *5 (E.D. Pa. Mar. 21, 2022) (internal citations omitted). *See also Gibson*, 2007 WL 951473, at *9;[22] *Taylor*, 184 F.3d at 315.

     It is undisputed that Defendant reflexively terminated Perez based upon her approval for LTD benefits instead of engaging in an interactive process[23] with her to determine whether it could

---

[22] In *Gibson*, the court noted that the employer did not comply with its ADA obligations because "at the time of Gibson's termination . . . [it] did not possess any information upon which to conclude that Gibson's request for extended leave was indefinite and therefore unreasonable. Lafayette merely acted on its 'no-fault' policy of terminating employees who were unable to return to work at the expiration of their FMLA leave." *Gibson*, 2007 WL 951473, at *9. As in *Gibson,* Defendant characterized Perez's LTD approval as a need for indefinite leave and "put the proverbial cart before the horse, as the evidence shows that [the defendant] failed to participate in the interactive process upon learning of [the employee's] request for an extension of her medical leave as an accommodation." *Id.* at *7. "In determining whether a leave request is a reasonable accommodation, the prospect of the employee's recovery from treatment or enablement to return to work should not be judged by hindsight, but rather, by what reasonably appears at the time the leave is requested." *Id.* at *9 n.16.

[23] Defendant claims that it engaged in an interactive process and attempted to accommodate her by "providing her with 140 days of leave, even after her statutorily protected leave ended." Def.'s Resp. in Opp. at 17-18. The record evidence, however, shows that upon the expiration of Perez's FMLA leave, Darden sent Perez a letter asking her about LTD benefits. When on November 16, 2017, Perez stated she had been approved for LTD benefits, Darden and Sappir met the next day to discuss obtaining confirmation of this from Lincoln, after which, on or before November 20, 2017, the termination decision

extend her medical leave by one month and have her return in a different position.[24] As such, EEOC has established that Defendant failed to make any effort to assist.

### iii) It is undisputed that Defendant could have reasonably accommodated Perez.

Regarding Perez's request for a transfer, Defendant has admitted that "[s]ince Ms. Perez's termination, the Defender had and continues to have a position at the Defender that it could place Ms. Perez in so long as she was or is medically cleared to return to work." SAMF at ¶ 36 (quoting SAMF at Ex. 20); *see also id.* at ¶ 37 (Bradford-Grey's testimony that it would have been easy to transfer Perez to a different position). In other words, at all times after January 2018, the end-date for her leave, Defendant had positions available that Perez could have filled. Thus, Perez's accommodation request for a transfer to a new role was reasonable. *See Donahue*, 224 F.3d at 230.

Likewise, allowing Perez to remain on unpaid medical leave until January 2018 could have been reasonably and easily accommodated. Perez was terminated on December 15, 2017, one month before she and Patterson planned for her to return in an alternative role. This Court, in denying Defendant's motion to dismiss, has already concluded that, to the extent Perez was planning on returning in January 2018, "Perez's accommodation request was not unreasonable as a matter of law." *EEOC v. Def. Ass'n of Phila.*, 408 F. Supp. 3d 621, 628 (E.D. Pa. 2019);[25] *see also Shannon v.*

---

had been made. That Defendant waited until November 29, 2017 to tell Perez she was being terminated, and then another two weeks to actually terminate her, is not evidence of Defendant accommodating Perez, which would have required them to allow her to remain on leave until January 2018. In fact, it is simply evidence that Defendant did not need to terminate Perez upon her LTD approval, as it waited about a month from when it decided to terminate her before actually doing so. Had Defendant instead granted Perez leave until January 2018, and a transfer, it would have satisfied its ADA obligations.

[24] Were Defendant's practice a neutral rule, and not automatically discriminatory towards disabled employees, Defendant would still be required to modify its practice as a reasonable accommodation. *See, e.g.*, 42 U.S.C. § 12111(9)(B) (defining "reasonable accommodation" to include "appropriate adjustment or modifications of . . . policies . . . . "); *US Airways, Inc. v. Barnett*, 535 U.S. 391, 397–98 (2002) (same); *EEOC v. UPMC*, 471 F. App'x 96, 99 (3d Cir. 2012) ( "The ADA prohibits, among other things, employers from discriminating against a qualified individual with a disability or a 'class of individuals' with disabilities, including through the application of neutral policies and by failing to provide reasonable accommodations absent undue hardship. ").

[25] Defendant seeks to distinguish the Court's ruling by noting that for purposes of the opinion, all

*City of Phila.*, 1999 WL 1065210, at *6 (E.D. Pa. Nov. 23, 1999) (noting that a jury could conclude

that a "request for an additional three months of unpaid leave for medical treatment was a reasonable

accommodation."). Accordingly, both accommodation requests were reasonable and Defendant could

have granted these accommodations.[26]

Accordingly, EEOC is entitled to summary judgment on its failure to accommodate claim.

---

inferences were construed in EEOC's favor. However, EEOC cites to this opinion because the Court
concluded that Perez's requested leave until January 2018, was not, as a matter of law, unreasonable. The
Court could not, at that time, determine whether Perez sought definite or indefinite leave. Now, with the
developed record, the Court need not make any inferences in EEOC's favor, as the undisputed facts prove
that Perez sought leave only until January 2018.

[26] Defendant has waived any undue hardship affirmative defense by failing to assert undue hardship in its
Answer. *See Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 614 (3d Cir. 2006) (noting that after
establishing that the accommodation was practical, "[t]he burden then shifts to Hershey to prove, as an
affirmative defense, that the accommodations requested by Turner are unreasonable, or would cause an
undue hardship on the employer. "); *Reilly v. Upper Darby Twp.*, 809 F. Supp. 2d 368, 382–83 (E.D. Pa.
2011) ( "Once a plaintiff shows that a proposed accommodation is possible, the burden shifts to the
defendant to prove, as an affirmative defense, that the requested accommodation is unreasonable or would
cause an undue hardship "); *Nadler v. Harvey*, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007)
("Undue hardship is an affirmative defense to be pled by an ADA defendant. "); *Riel v. Elec. Data Sys.
Corp.*, 99 F.3d 678, 684 (5th Cir. 1996) (noting that the employer "may not place the burden of proof of
undue hardship on [the employee] merely by refusing to plead the affirmative defense and then attacking
his proposed accommodations as unreasonable in his specific circumstance; Congress' intent was to place
that burden on the employer. "); *Lenkiewicz v. Castro*, 118 F. Supp. 3d 255, 265 (D.D.C.) ("Finally,
plaintiff correctly claims that HUD's undue hardship defense fails since undue hardship is an affirmative
defense and HUD failed to plead it in their Answer to Amended Complaint."). Arguing that its failure to
plead this defense is not a waiver, Defendant cites to cases unhelpful to it: *Salgado v. Iqvia, Inc.*, brought
exclusively under California state law, specifically California's Pregnancy Disability Leave Law and the
California Family Rights Act, and which does not discuss undue hardship under the ADA. 459 F. Supp.
3d 1318, 1325 (S.D. Cal. 2020); and *EEOC v. GEO Grp., Inc.*, a Title VII religious accommodation case
in which the employer "moved for summary judgment, in part asserting the affirmative defense that it
would be an undue hardship [to accommodate the employee]." 616 F.3d 265, 270 (3d Cir. 2010).
Importantly, unlike Defendant, the employer in *Geo* pled undue hardship in its Answer and thus, did not
waive this affirmative defense. *See EEOC v. Geo Grp.*, Inc., 07-cv-04043 (E.D. Pa.) at ECF No. 6.
Defendant's waiver notwithstanding, the record does not support that Defendant would have suffered an
undue hardship by accommodating Perez. Defendant's generous six months of job-protected leave policy
towards the parents in its workforce undermines any argument that affording Perez an additional month of
unpaid leave would result in an undue hardship. SAMF at ¶ 38. Defendant's claim that holding "Perez's
position open indefinitely would cause an undue hardship," Def.'s Resp. in Opp. at 21, ignores that Perez
sought a definitive amount of leave and, more importantly, that Perez sought a transfer out of the JSCS
position as of September 2017. Thus, Defendant was not being asked to hold her position open.
Defendant's claims of hardship, as with its claims that Perez sought indefinite leave, are entirely
unfounded.

## IV. CONCLUSION

As detailed above and in EEOC's Motion for Summary Judgment, its Response to Defendant's Motion for Summary Judgment, ECF No. 118, and its Sur-Reply to Defendant's Motion for Summary Judgment, ECF No. 135, the undisputed record evidence establishes that Defendant failed to accommodate Perez's reasonable accommodation requests and wrongfully terminated her in violation of the ADA. Further, neither the record evidence nor the law supports Defendant's First Affirmative Defense, which Defendant has not contested. Thus, for the reasons set forth herein and in its Motion, EEOC respectfully requests that the Court enter judgment as a matter of law in favor of EEOC and against Defendant as to EEOC's wrongful termination claim, its failure to accommodate claim, and as to Defendant's First Affirmative Defense.

Dated: July 24, 2023                                Respectfully Submitted,

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

DEBRA M. LAWRENCE
Regional Attorney

*/s/ Maria Luisa Morocco*
Maria Luisa Morocco
Assistant Regional Attorney
U.S. EEOC, Washington Field Office
131 M Street, N.E. Suite 4NW02F
Washington, D.C. 20507
Phone: 202-419-0724
maria.morocco@eeoc.gov

/s/ Joshua E. Zugerman
JOSHUA E. ZUGERMAN
Senior Trial Attorney
U.S. EEOC, Philadelphia District Office
801 Market Street, Suite 1300
Philadelphia, PA 19107
Phone: (267) 589-9763
Fax: (215) 440-2848
joshua.zugerman@eeoc.gov