**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**<br>**Plaintiff,**<br>**v.**<br>**DEFENDER ASSOCIATION OF PHILADELPHIA**<br>**Defendant.** | **CIVIL ACTION NO. 19-1803** |

**MEMORANDUM OPINION**

**Rufe, J.** **August 29, 2024**

Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), filed suit against Defendant, the Defender Association of Philadelphia, alleging that the Defender Association failed to provide "M.P."[1] with a reasonable accommodation for her disability and terminated her employment in violation of the Americans with Disabilities Act ("ADA").[2] EEOC has moved to exclude the Defender Association's expert, Irene Mendelson, and both parties have moved for summary judgment. For the reasons stated below, EEOC's Motion to Exclude will be granted and EEOC's Motion for Summary Judgment will be granted in part and denied in part. The Defender Association's Motion for Summary Judgment will be denied.

## I. BACKGROUND

### A. Case Facts

The Defender Association provides legal defense for indigent juveniles and adult criminal defendants. In September 2007, charging party M.P. began working as a full-time staff

---

[1] In light of some of the sensitive medical issues discussed and because the charging party is not a party to this litigation, the Court will only use the charging party's initials throughout this Memorandum Opinion.

[2] *See* Compl. [Doc. No. 1]; 42 U.S.C. § 12112.

attorney for the Defender Association.[3] M.P. was promoted multiple times over the years. In July 2012, the Defender Association promoted M.P. to Assistant Supervisor of the Juvenile Special Cases section ("JSCS") where her role involved defending juveniles charged with sex-based crimes.[4] A year later, in July 2013, the Defender Association promoted M.P. to Supervisor of Juvenile Special Cases Section.[5] In June of 2014, M.P. was assigned as a Sexually Violent Predator Specialist.[6] In April 10, 2017, M.P. applied for and was again assigned to the position of Supervisor of the Juvenile Special Cases Section.[7]

On July 26, 2017, M.P. began therapy sessions with Laurie Patterson, a licensed clinical social worker.[8] Two days later, the Defender Association approved M.P.'s medical leave of absence under the Family and Medical Leave Act ("FMLA").[9] Patterson diagnosed M.P. with Post-Traumatic Stress Disorder ("PTSD") and Major Depressive Disorder ("MDD") on August 1, 2017.[10]

The Defender Association's employees are entitled to receive short-term disability benefits.[11] Defendant's short-term disability insurance policy provides for a maximum of 11

---

[3] Statement of Stipulated Material Facts [Doc. No. 165] ¶ 1.

[4] *Id.* ¶ 2

[5] *Id.* ¶ 3.

[6] *Id.* ¶ 4.

[7] *Id.* ¶ 5.

[8] *Id.* ¶ 6; *see also* EEOC's Mot. Summ. J., Ex. 2, Patterson Dep. Tr. [Doc 127- 5] at 11; EEOC's Mot. Summ. J., Ex. 3, Pennsylvania State Department Verification of Clinical Social Worker license [Doc. No. 127-6].

[9] Statement of Stipulated Material Facts [Doc. No. 165] ¶ 7.

[10] *Id.* ¶ 8.

[11] *See* EEOC's Mot. Summ. J., Ex. 6, Defender Association's Open Enrollment Newsletter [Doc. No. 127-9].

weeks of coverage, after which the employee either may return to work or apply for long-term disability.[12] M.P. was approved for short term disability benefits in the summer of 2017.[13]

In October of 2017, Patterson prepared an Intake, Record Summary, and Assessment for M.P. ("the October 2017 Medical Memorandum").[14] In a section of the October 2017 Medical Memorandum titled "Recommendations going forward," Patterson wrote:

> The plan is for [M.P.] to return to her job in January 2018. I am unable to currently say at this time whether that is feasible, but if it is, I would recommend that she phase in part time as it has been very hard for her to tolerate discussions about work in our sessions, and the one time she went to the office, she had a panic attack and was unable to go into the building.
>
> I do not currently see that it would be wise or advisable for her to resume work in any capacity where she needs to perform work in the previous role as related to working as a mitigation specialist or trainer working with the sex offender population. While [M.P.] has a passion for social justice she and the Defender Association may be better served if she works in a less triggering unit at this organization.
>
> Thank you for your interest in this interesting and capable individual.
>
> Please do not hesitate to contact me if you have any further questions or concerns.[15]

In November 2017, Patterson provided the October 2017 Medical Memorandum to Lincoln Financial, Defendant's short-term and long-term disability insurance provider, and Lincoln approved M.P. for long term disability ("LTD") benefits.[16] Internal records from Lincoln indicated that M.P. had a potential return to work date of January 18, 2018, but that Lincoln should check in with M.P. in November regarding the "progress or improvement on returning

---

[12] *Id.*

[13] Def.'s Reply Def.'s Mot. Summ. J., Ex. 9, September 13, 2017 Letter [Doc. No. 166-2].

[14] Statement of Stipulated Material Facts [Doc. No. 165] ¶ 9.

[15] *Id.* ¶ 10.

[16] EEOC's Mot. Summ. J., Ex. 11, Lincoln Chronological Activity List [Doc. No. 127-14].

back to work."[17] Lincoln records also indicated that the vocational rehabilitation provider terminated its services with M.P. "as claimant was non responsive to [voicemails] for [return to work] intervention."[18] Sherri Darden, the Defender Association's Human Resources Manager, was notified in November that M.P. had been approved for LTD benefits.[19] On November 17, 2017, at Darden's request, M.P. provided Darden with Patterson's October 2017 Medical Memorandum.[20] After receiving this letter, Darden discussed next steps with HR Director Mark Sappir.[21] On December 14, 2017, Darden sent M.P. a letter stating that she was being terminated effective December 15, 2017.[22] M.P. remained on long term disability benefits until the fall of 2018.[23]

## II. MOTION TO EXCLUDE

The Defender Association has produced the five-page expert report of Irene Mendelson, a vocational counselor, and seeks to offer her expert testimony at trial. Although the Defender Association originally stated that this report would opine on whether M.P. could perform the essential functions of her job,[24] the report instead discusses the reasonableness of Defendant's

---

[17] Pl.'s Mot. Summ. J., Ex. 11, Lincoln Chronological Activity List [Doc. No. 127-14] at 4.

[18] *Id.*

[19] Pl.'s Mot. Summ. J., Ex. 15, Darden Dep. [Doc. No. 127-18] at 108–09.

[20] *Id.* at 129–31.

[21] *Id.* at 111–12.

[22] Statement of Stipulated Material Facts [Doc. No. 165] ¶ 11.

[23] Def.'s Reply Def.'s Mot. Summ. J., Ex. 18, Lincoln Letter, dated November 2, 2018 [Doc. No. 166-11].

[24] *See* Def.'s Mot. Permit Its Expert to Interview Claimant [Doc. No. 87-1] at 4–5. An expert opinion that discussed M.P.'s ability to perform the essential functions of her job would be directly relevant to the issues of the case. To establish a *prima facie* case of discrimination, a plaintiff must establish that she: (1) is "disabled," (2) is a "qualified individual," (3) has suffered an adverse employment action because of that disability. *Buskirk v. Apollo Metals,* 307 F.3d 160, 166 (3d Cir. 2002). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can *perform the essential functions of the employment position* that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added).

decision to terminate M.P. ("the Termination Opinion") and M.P.'s mitigation efforts after her termination ("the Mitigation Opinion"). EEOC moves to exclude the report and expert testimony of Mendelson, because her report and opinion (1) will not help the trier of fact understand the evidence or determine a fact in issue; (2) are not based on sufficient facts or data; and (3) are not reliable.

**A. Legal Standard**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[25]

The focus of the Court's inquiry must be on the expert's methods, not the expert's conclusions. The Third Circuit has interpreted Rule 702 as setting forth three requirements: (1) the expert must be qualified; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.[26] The proponent of the expert testimony has the burden to show by a preponderance of the evidence that their expert's opinion is reliable.[27] District courts have "broad discretion in

[25] Fed. R. Evid. 702.

[26] *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008); *accord In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741–43 (3d Cir. 1994).

[27] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

determining the admissibility of evidence, and 'considerable leeway' in determining the reliability of particular expert testimony . . . ."[28]

Under the first requirement, "a broad range of knowledge, skills, and training qualify an expert as such."[29] However, courts have rejected the idea that witnesses offered as experts must meet "overly rigorous requirements of expertise," so long as they have "more generalized qualifications."[30] Under the second requirement, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable."[31] An expert's opinion is reliable if it is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation . . . .'"[32] The experts must have good grounds for their opinions, but not necessarily the best grounds or unflawed methods.[33] District courts consider several factors in determining reliability, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[34]

---

[28] *Walker v. Gordon*, 46 F. App'x 691, 694 (3d Cir. 2002) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152–53 (1999)).

[29] *Paoli*, 35 F.3d at 741.

[30] *Id.*

[31] *Id.* at 742.

[32] *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)).

[33] *See Holbrook v. Lykes Bros. S.S. Co.,* 80 F.3d 777, 784 (3d Cir.1996); *Paoli,* 35 F.3d at 744–45.

[34] *Pineda*, 520 F.3d at 247–48 (citing *Paoli*, 35 F.3d at 742 n.8).

Under the third requirement—whether the expert's testimony will assist the trier of fact—"the Court must determine the 'fit' of the expert's testimony as it relates to the case at hand. . . ."[35] The fit requirement "goes primarily to relevance."[36]

**B. The Termination Opinion**

Mendelson's opinion on the reasonableness of Defendant's decision to terminate M.P. does not "fit" the case at hand and therefore, will not help the trier of fact understand the evidence or determine a fact in issue. Mendelson opines that the Defender Association's decision to terminate M.P. was "reasonable" because "[M.P.'s] diagnoses amounted to a disability that made her unable to work as an attorney."[37]

The essential questions for the jury in this case will be (1) whether M.P. was a "qualified" individual under the ADA, defined as an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires[38] and (2) whether Defendant failed to accommodate M.P.[39] Mendelson's report does not shed light on these questions. Mendelson relies on largely irrelevant facts to reach her conclusion. Mendelson provides four reasons to undergird her opinion that the termination of M.P. was "reasonable": (1) In late November 2017 when the termination was decided, M.P. was not able to work due to her disability; (2) M.P. or her therapist, Laurie Patterson, could have objected to the termination prior to its actual occurrence, but neither did;

---

[35] *Macaluso v. Apple, Inc.*, No. 21-1361, 2023 WL 4685965, at *4 (E.D. Pa. July 21, 2023).

[36] *Daubert*, 509 U.S. at 591.

[37] Pl.'s Mot. Exclude, Ex. 7, Mendelson Report [Doc. No. 129-8] at 3.

[38] 42 U.S.C. § 12111(8).

[39] A failure to accommodate claims requires a determination of whether: (1) M.P. was disabled, (2) requested accommodations, (3) the Defender Association did not make a good faith effort to assist, and (iv) whether the Defender Association could have reasonably accommodated M.P. *See Capps v. Mondelez Global, LLC*, 847 F. 3d 144, 157 (3d. Cir. 2017).

(3) M.P. had been approved for STD and LTD benefits, which meant that she could not work as an attorney when she was terminated; and (4) M.P. continued to receive LTD benefits until the fall of 2018 and that "while it was obviously unknown by [Defendant] at the time of termination how long [M.P.] would remain disabled from working as an attorney, the length of time now known that she was disabled from engaging in that work lends strong support to the appropriateness of the decision."[40]

Mendelson's first reason—that M.P. was unable to work in November 2017 due to a disability—is undisputed. The fact that M.P. was not able to work due to a disability, while on disability leave, cannot factor into a decision on whether her termination was "reasonable."[41] Instead, the relevant inquiry is "whether the amount of time requested off [was] reasonable such that it would allow the employee to perform . . . her essential job functions in the near future."[42]

Second, Mendelson claims that M.P. and her therapist Patterson had an opportunity to object to the termination prior to its occurrence, and since they did not, this is indicative of the reasonableness of Defendant's termination decision. Such inferences are for the jury and there is nothing about Mendelson's expert background that provides her with additional knowledge to adduce a conclusion based on this fact.[43]

---

[40] Pl.'s Mot. Exclude, Ex. 7, Mendelson Report [Doc. No. 129-8] at 4.

[41] *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 150–51 (3d Cir. 2004) (distinguishing the New Jersey Administrative Code, which does not require employers to provide accommodations when the employee "cannot *presently perform* the job even with reasonable accommodation," from the ADA, under which leave is a reasonable accommodation); *Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 701 (E.D. Pa. 2010) ("It would be entirely against the import of the ADA if [the plaintiff] were not considered qualified because he was not able to perform his essential job functions during his leave, as leave itself was the accommodation requested . . . .").

[42] *Sowell v. Kelly Services, Inc.*, 139 F. Supp. 3d 684, 701 (E.D. Pa. 2015) (citations and quotations omitted).

[43] *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000) ("As a general principle, [e]xpert evidence is not necessary . . . if all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training of the subject under investigation.") (citations and quotations omitted).

Mendelson's third reason for determining that the Defender Association's termination decision was reasonable is that M.P. was awarded short-term and long-term disability benefits prior to the termination. The fact that M.P. received disability benefits does not in itself establish that she could not perform the essential functions of a job with reasonable accommodation after a certain time. To the extent it is relevant, it is within the province of the jury.

Mendelson's fourth reason is that M.P. continued receiving long-term disability benefits for nearly a year after she was terminated and that she remained in treatment. "In determining whether a leave request is a reasonable accommodation, the prospect of the employee's recovery from treatment or enablement to return to work should not be judged by hindsight, but rather, by what reasonably appears at the time the leave is requested."[44] Relying on the LTD benefits M.P. received after her termination is improper because it depends on information unknown to the Defendant at the time of M.P.'s termination and discounts potentially new reasons for her continuation of LTD benefits.[45]

The Defender Association argues that the Court should not exclude expert testimony simply because EEOC disagrees with the underlying facts or conclusions contained in the report, and instead that the Court should focus "solely on principles and methodology."[46] However, Mendelson does not explain what methodology she employed in reaching her conclusions. Since Mendelson relies on largely irrelevant facts, does not state a methodology, and reaches a

---

[44] *Gibson v. Lafayette Manor, Inc.*, No. 05-1082, 2007 WL 951473, at *23, n.16 (W.D. Pa. Mar. 27, 2007) (citations omitted).

[45] In fact, Patterson testified that M.P.'s therapy plans changed in part due to the stress caused by the termination. EEOC's Mot. Exclude, Ex. 3, Patterson Dep. Tr. [Doc 129- 4] at 77–78, 82–84. This was wholly unaddressed in the expert report.

[46] Def.'s Resp. Opp'n. Pl.'s Mot. Exclude [Doc. No. 137] at 4–5 (quoting *Daubert*, 509 U.S. at 580).

conclusion that would be unhelpful to a jury, her opinion on the reasonableness of the Defender Association's termination decision will be excluded.

### C. The Mitigation Opinion

In the final paragraph of the five-page expert report, Mendelson concludes that M.P.'s mitigation efforts were below appropriate job search efforts. Mendelson states that her opinion is based on "multiple factors including the very low unemployment rate (particularly for individuals with higher levels of education), and that according to data provided by both the U.S. Department of Labor, the Office of Occupational Statistics and Employment Projects, and Chron.,[47] employment opportunities for attorneys were projected to grow at a high-very high rate."[48] Mendelson opines that M.P. should have obtained full-time employment within three to six months after she stopped receiving LTD benefits in November 2018.

Mendelson does not clarify whether the "multiple factors" that she relied on were solely the data from the mentioned sources or whether she used additional factors. Nor does Mendelson attach the specific rates and data that she relies upon, leaving the Court in the dark as to how she employed the data in her analysis. Mendelson does not articulate any methodology for reaching her conclusion. Instead, the Court must guess how "multiple factors" led her to conclude that M.P. should have been employed within three to six months after she stopped receiving benefits. Because the mitigation opinion is conclusory and will not assist the trier of fact, it will be excluded. This does not preclude the Defender Association from producing admissible and relevant evidence of mitigation at trial.

---

[47] Mendelson does not define "Chron."
[48] Pl.'s Mot. Exclude, Ex. 7, Mendelson Report [Doc. No. 129-8] at 4.

## III. SUMMARY JUDGMENT

The parties have filed cross-motions for summary judgment on EEOC's two claims brought pursuant to the ADA: (1) that the Defender Association terminated M.P. on the basis of her disability and (2) that it failed to provide her with reasonable accommodation. EEOC also seeks summary judgment on the Defender Association's First Affirmative Defense, regarding administrative prerequisites. In addition, the Defender Association moves for summary judgment on EEOC's request for injunctive relief, asserting that the claim is moot, and to limit the damages that may be awarded.

### A. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.[49] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[50] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[51]

A court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[52] Further, a court may not weigh the evidence or make credibility determinations.[53] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the

---

[49] *See* Fed. R. Civ. P. 56(a).

[50] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[51] *Id.*

[52] *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citation omitted).

[53] *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

record.[54] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[55]

**B. Wrongful Termination**

The ADA prohibits employers from discriminating against any qualified individual on the basis of their disability.[56] In the absence of direct evidence, the *McDonnell Douglas* burden shifting framework applies to discrimination claims under the ADA.[57] To make out a *prima facie* case of discrimination under the ADA, EEOC must show that M.P.: (1) was disabled,[58] (2) was a qualified individual, and (3) suffered an adverse employment action because of that disability.[59] For the purposes of summary judgment, both parties agree that M.P. was disabled and that her termination constituted an adverse employment action.

The Defender Association and EEOC dispute whether M.P. was a "qualified" individual. A two-part test is used to determine whether a person is qualified: "[f]irst, a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." and second, "whether or not the individual can perform the essential functions of the position held or desired,

---

[54] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[55] *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

[56] 42 U.S.C. § 12112(a).

[57] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (apply *McDonnell Douglas* to an ADA claim). Under the burden shifting framework, the Plaintiff must first establish a *prima facie* case. After this, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision. If the defendant meets this burden, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonable either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See Fuentes v. Perksie*, 32 F.3d 759, 763 (3d Cir. 1994).

[58] A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment. . . ." *See* 42 U.S.C. 12102(2).

[59] *Buskirk v. Apollo Metals,* 307 F.3d 160, 166 (3d Cir. 2002).

with or without reasonable accommodation."[60] Neither party disputes that M.P. had the necessary prerequisites and skills for the job or that she dutifully served as a public defender up until the date of her medical leave.

Defendant argues that M.P. was not a qualified individual because she was unable to perform the essential duties of her job at the date of her termination in December 2017. However, since M.P. was on a medical leave of absence at the time of her termination, the appropriate inquiry is not whether she was able to perform the essential duties of her job in December 2017.[61] Instead, the Court must focus on whether the amount of time off M.P. requested was reasonable such that it would allow "the employee to perform . . . her essential job functions in the near future."[62]

A material factual dispute remains as to whether M.P.'s time off request was reasonable. While a leave of absence may constitute a reasonable accommodation under the ADA, a leave of absence for an indefinite period of time is not a reasonable accommodation.[63] EEOC maintains that M.P. would have been able to perform the essential duties of her job if she were granted two

---

[60] *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (quotations and citations omitted).

[61] Generally, courts consider if the individual can perform the job's essential functions at the time the employment decision was made. *Id.* at 580. However, this is not the appropriate timeframe to analyze a claimant's ability to perform her job if she is on a reasonable leave of absence. *See Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F. 3d 135, 151 (3d Cir. 2004) ("[T]he federal courts that have permitted a leave of absence as a reasonable accommodation under the ADA have reasoned . . . that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future."); *Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 701 (E.D. Pa. 2010) ("It would be entirely against the import of the ADA if [claimant] were not considered qualified because he was not able to perform his essential job functions during his leave, as leave itself was the accommodation requested by [claimant]."); *Shannon v. City of Philadelphia,* No. 98–5277, 1999 WL 1065210, at *6 (E.D. Pa. Nov. 23, 1999) ("Viewing the evidence in the light most favorable to [plaintiff], the court finds that a reasonable jury could conclude that [plaintiff's] request for an additional three months of unpaid leave for medical treatment was a reasonable accommodation."); *Gibson v. Lafayette Manor, Inc.*, No. 05-1082, 2007 WL 951473, at *7 (W.D. Pa. Mar. 27, 2007) ( "[T]he fact that [the employee] could not return to work in any capacity at the expiration of her FMLA leave is not dispositive of whether she is a 'qualified individual'").

[62] *Sowell v. Kelly Services, Inc.*, 139 F. Supp. 3d 684, 701 (E.D. Pa. 2015) (citations omitted).

[63] *Fogleman v. Greater Hazleton Health Alliance,* 122 Fed. Appx. 581, 585–86 (3d Cir.2004) (holding that an indefinite or open-ended leave "does not constitute a reasonable accommodation").

accommodations: to remain on medical leave until January 2018 and to be transferred to an available position that did not require her to work on cases involving sex crimes.[64] Defendant claims that M.P. was not planning on returning to work in January 2018 and was instead seeking *indefinite* leave. Defendant bases this claim on her therapist's October 2017 Medical Memorandum, which states, in part, that "[t]he plan is for [M.P.] to return to her job in January 2018. I am unable to currently say at this time whether that is *feasible*."[65]

Viewing the evidence in the light most favorable to EEOC, a reasonable jury could conclude based on the October 2017 Memorandum that M.P. could return in January 2018 with accommodation. EEOC's argument is bolstered by the fact that Patterson testified in her deposition that the "feasibility" language in the letter was about M.P. returning to her previous role involving sex crimes (not about her start date in January 2018)[66] and that, if Defendant had contacted her, Patterson would have clarified that M.P. could return to work in January 2018 if she were placed in a non-sex crimes unit.[67]

However, viewing the evidence in the light most favorable to the Defender Association, a reasonable jury could conclude that it was unlikely that M.P. could return to work in January 2018 and that she would require disability leave for an undefined period. The Defender Association's interpretation of the letter is supported by M.P.'s verification on her LTD form that

---

[64] Pl.'s Mot. Summ. J. [Doc. No. 127-1] at 1. EEOC is required to establish that M.P. was able to perform the essential functions of the alternative position when she returned. *See Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997) ("As we held in *Shiring,* the employee has the duty to identify a vacant, funded position whose essential functions he is capable of performing. *Shiring,* 90 F.3d at 832. But we do not suggest that the employee has the burden of identifying an open position before the employer's duty of accommodation is triggered. In many cases, an employee will not have the ability or resources to identify a vacant position absent participation by the employer. Simply put, a disabled employee seeking reassignment will be best served by employer and employee working together to identify suitable positions.").

[65] Statement of Stipulated Material Facts [Doc. No. 165] ¶ 10.

[66] EEOC's Mot. Summ. J., Ex. 2, Patterson Dep. Tr. [Doc 127- 5] at 100.

[67] *Id.* at 68–69.

she was "totally disabled" and the fact that—as written in the October 2017 Medical Memorandum—she had a panic attack the one time she had attempted to enter the office building that fall.[68] These are questions that must be resolved at trial.

Under the *McDonnell Douglas* framework, after *a prima facie* case has been established, "the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason'" for the adverse action against the employee.[69] Defendant contends that it terminated M.P. for a non-discriminatory reason, namely that M.P. was seeking an unreasonable accommodation of indefinite leave.[70] As explained above, a reasonable jury could conclude that the Defender Association had a legitimate basis for the termination. Shifting back to EEOC's burden to show that the real reason was discriminatory, EEOC maintains that M.P. was terminated solely because she signed up for LTD benefits, which would be discriminatory because it foregoes the ADA's requirement of an interactive process and "targets qualified individuals with disabilities for termination."[71] However, the evidence establishes that there were discussions in the fall of 2017 about M.P.'s accommodation requests. Furthermore, M.P. was later non-responsive to Lincoln Financial's voicemails about return-to-work intervention.[72] The conflicting evidence requires the Court to deny summary judgment on the disability claim. A jury must decide what happened and whether M.P. sought a reasonable accommodation.

---

[68] *See* Def.'s Reply Def.'s Mot. Summ. J., Ex. 17 [Doc. No. 166-10]; Statement of Stipulated Material Facts [Doc. No. 165] ¶ 10.

[69] *McDonnell Douglas*, 411 U.S. at 802.

[70] Def.'s Reply Supp. Def.'s Mot. Summ. J. [Doc. No. 166] at 20.

[71] Pl.'s Resp. Opp'n. Def.'s Mot. Summ. J. [Doc. No. 150] at 10.

[72] Pl.'s Mot. Summ. J., Ex. 11, Lincoln Chronological Activity List [Doc. No. 127-14] at 4.

**C. Failure to Accommodate Claim**

Under the ADA, a failure to make a reasonable accommodation for a disabled and qualified employee constitutes discrimination.[73] As stated above, there is a material factual dispute as to whether M.P. was a qualified individual. If a jury were to find that M.P. was a qualified individual because she sought leave only until January 2018, then EEOC must establish the following elements for a failure to accommodate claim: (1) M.P. was disabled and her employer knew it; (2) she requested an accommodation or assistance; (3) her employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated.[74] Neither party disputes that M.P. was disabled and requested an accommodation.

The parties disagree on whether the Defender Association made a good faith effort to assist. "Reasonable accommodation . . . includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith under what has been termed a duty to engage in the 'interactive process.'"[75] "Once the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs."[76]

The Defender Association initially engaged in an interactive process with M.P. However, this changed in November 2017, after Darden requested and received Patterson's October 2017 Memorandum and M.P. was approved for long term disability benefits. The record is unclear as to whether M.P. planned to return to work in January 2018. Lincoln Financial records, dated

---

[73] *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 311 (3d Cir. 1999).

[74] *See Capps v. Mondelez Global, LLC*, 847 F. 3d 144, 157 (3d. Cir. 2017).

[75] *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004) (internal citations omitted).

[76] *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999).

December 11, 2017, indicate that M.P. was not responsive to voicemails for return-to-work intervention.[77] Thereafter, Defendant terminated M.P., effective December 15, 2017.

The remaining question is whether M.P. could have reasonably been accommodated without placing an undue burden on the Defender Association. If a jury concluded that M.P. was seeking indefinite leave, then a jury would likely find that such a request poses an undue hardship on the defendant, as it is not reasonable for the Defender Association to hold open a position for M.P. indefinitely.[78]

When a claimant is seeking a transfer to a different position, "the plaintiff bears the burden of demonstrating: (1) that there was a vacant, funded position; (2) that the position was at or below the level of the [claimant's] former job; and (3) that the [claimant] was qualified to perform the essential duties of this job with reasonable accommodation. If the employee meets [her] burden, the employer must demonstrate that transferring the employee would cause unreasonable hardship."[79] A reasonable jury can conclude that it would not have been an undue burden on the Defender Association to transfer M.P. to a different position in January 2018, if that was in fact the accommodation she requested. Because, as explained above, the question of indefinite leave is a jury question, summary judgment on the failure to accommodate claim will be denied.

**D. Defendant's First Affirmative Defense**

EEOC also moves for summary judgment on Defendants first affirmative defense, which states that "EEOC failed to meet its duty of good faith conciliation efforts between the parties."[80]

---

[77] Pl.'s Mot. Summ. J., Ex. 11, Lincoln Chronological Activity List [Doc. No. 127-14] at 4.

[78] *Fogleman v. Greater Hazleton Health Alliance,* 122 Fed. Appx. 581, 585–86 (3d Cir. 2004) (holding that an indefinite or open-ended leave "does not constitute a reasonable accommodation").

[79] *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000).

[80] Ans. [Doc. No. 26] at 11.

Defendant admits that EEOC engaged in conciliation efforts, but claims that such efforts were not done in good faith.[81] EEOC seeks summary judgment on this defense because such an argument is foreclosed by *Mach Mining, LLC v. EEOC*, which held that the conciliation requirement "eschew[s] any reciprocal duties of good faith negotiations."[82] Defendant does not refute this or respond to this argument. Therefore, summary judgment will be granted in favor of EEOC as to Defendant's first affirmative defense.

**E. Injunctive Relief and Damages**

Defendant seeks summary judgment on EEOC's request for injunctive relief, arguing that such relief is moot because, during this litigation, the Defender Association implemented all the noneconomic changes that EEOC is requesting.[83] Summary judgment will be denied for two reasons. First, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot."[84] The mere fact that the Defender Association engaged in remedial action after it had been sued does not necessarily provide adequate assurances that it will not repeat an alleged violation in the future. Second, EEOC actively contests that the Defender Association has implemented all the changes that it seeks, including a policy that specifically acknowledges medical leave as an available accommodation.[85] For these reasons, the Court denies summary judgment on EEOC's claim for injunctive relief.

[81] Ans. [Doc. No. 26] at 5–6.

[82] 575 U.S. 480, 491 (2015).

[83] *See* Compl. [Doc. No. 1] at 8 (seeking, *inter alia*, a permanent injunction to preclude violation of the ADA, institution of policies, practices, and programs to eradicate unlawful employment practices, including an ADA policy that identifies medical leave as a possible accommodation).

[84] *Defunis v. Odegaard*, 416 U.S. 312, 318 (1874) (citations and quotations omitted).

[85] Pl.'s Resp. Opp'n. Def.'s Mot. Summ. J. [Doc. No. 150] at 23.

Next, Defendant argues that M.P. is not entitled to back or front pay damages.[86] First, Defendant argues that, even if it prematurely terminated M.P., she would only be entitled to one month of back pay because it terminated her in December 2017, one month before she was supposedly planning to resume work. Defendant uses an incorrect definition of backpay to reach such a conclusion. Back pay accrues "from the time of discrimination until trial," though it stops accruing "[w]hen a plaintiff finds employment that is equivalent or better than the position she was wrongly denied . . . ."[87] Back pay would not be calculated based on the time between her termination and the date that she allegedly was set to return to work. Second, Defendant argues that front pay damages are "cut off" because Defendant offered to reinstate M.P. and M.P. failed to mitigate her damages. Such an argument is premature at this stage as there are material disputes as to whether (1) the Defender Association offered to reinstate M.P. with the required level of specificity and (2) whether M.P. failed to mitigate her damages. Summary judgment will be denied as to the scope of possible relief.

## IV.  CONCLUSION

For the reasons stated above, EEOC's Motion to Exclude will be granted and EEOC's Motion for Summary Judgment will be granted as to Defendant's First Affirmative Defense and otherwise denied. The Defender Association's Motion for Summary Judgment will be denied. An order will be entered.

---

[86] Defendant argues for the first time about punitive damages in its reply. Therefore, such an argument is waived. *See Laborers' Int'l Union of N. Am. V. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).

[87] *Donolin v. Philips Lighting North America Corp.*, 581 F.3d 73, 84–86 (3d Cir. 2009).